SAN DIEGO COUNTY GUN RIGHTS COMMITTEE; Mark Bruce Skane; Henri Jon Donald Buettner; John Wallner; and San Diego Militia; Plaintiffs–Appellants,

v.

Janet RENO, Attorney General of the United States of America; Frank Newman, acting Secretary of the Treasury; Bureau of Alcohol, Tobacco, and Firearms, Defendants–Appellees.

No. 95–55811.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 1996.

Decided Oct. 22, 1996.

Peter D. Lepiscopo, San Diego, CA, for plaintiffs-appellants.

Michael S. Raab, United States Department of Justice, Washington, DC, for defendants-appellees.

Before: FLETCHER and TASHIMA, Circuit Judges, and RESTANI, Court of International Trade Judge.*

* The Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

TASHIMA, Circuit Judge:

## I

This case presents a pre-enforcement challenge to the constitutionality of Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994) (the "Crime Control Act" or "the Act"). Two unincorporated associations and three individuals (collectively, "plaintiffs") seek declaratory and injunctive relief under the Commerce Clause and the Second and Ninth Amendments. The district court dismissed the action on standing and ripeness grounds. We affirm.

## II. BACKGROUND

The Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921–930 (the "GCA"), regulates the manufacture and distribution of firearms. On September 13, 1994, Congress passed the Crime Control Act, which amends the GCA. It prohibits, for a period of 10 years, the manufacture, transfer or possession of semiautomatic assault weapons and the transfer or possession of "large capacity ammunition feeding device[s]." 18 U.S.C. §§ 922(v)(1), 922(w)(1). The Act exempts government agencies and law enforcement officers, as well as firearms transferred to an individual upon retirement from a law enforcement agency. 18 U.S.C. §§ 922(v)(4)(A) & (C), 922(w)(3)(A) & (C). In addition, the "grandfather" provisions of the Act permit the possession or transfer of semiautomatic assault weapons and large capacity ammunition feeding devices that were lawfully possessed on the date of enactment. 18 U.S.C. §§ 922(v)(2), 922(w)(2).

The Crime Control Act imposes new requirements on applicants for federal firearms licenses. For example, applicants must certify that the business to be conducted under the license (1) is not prohibited by state or local law, and (2) will comply with the requirements of state and local law. 18 U.S.C. § 923(d)(1)(F)(i) & (ii). Violations of the firearms or false certification provisions may result in fines, imprisonment, or both. 18 U.S.C. §§ 924(a)(1)(A) & (B), 3571(b). False certification may also result in license revocation. 18 U.S.C. § 923(e).

The two association plaintiffs are the San Diego County Gun Rights Committee and San Diego Militia. The three individual plaintiffs are John Wallner, president of the San Diego Militia; Mark Bruce Skane, a licensed federal firearms dealer; and Henri Jon Donald Buettner, a retired Marine Corps officer. None of the plaintiffs has been prosecuted, arrested or incarcerated for violation of the Crime Control Act. Plaintiffs challenge the constitutionality of the Crime Control Act under the Commerce Clause and the Second and Ninth Amendments. Seeking declaratory and injunctive relief, plaintiffs allege that they "wish and intend" to engage in unspecified conduct prohibited by the Act.

■ The district court granted defendants' motion to dismiss. *San Diego County Gun Rights Comm. v. Reno,* 926 F.Supp. 1415 (S.D.Cal.1995). Because the district court's dismissal was without leave to amend, and thus evidenced an intent to dispose of the action, it is a final, appealable order. *Gerritsen v. de la Madrid Hurtado,* 819 F.2d 1511, 1514–15 (9th Cir.1987). We have jurisdiction under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

■ Standing and ripeness are questions of law, which we review *de novo. Carson Harbor Village Ltd. v. City of Carson,* 37 F.3d 468, 474 (9th Cir.1994) (ripeness); *Barrus v. Sylvania,* 55 F.3d 468, 469 (9th Cir. 1995) (standing). We review for clear error the factual determinations underlying the district court's decision on standing. *American–Arab Anti–Discrimination Comm. v. Thornburgh,* 970 F.2d 501, 506 (9th Cir.1991).

## IV. STANDING

■ We note at the outset that in *Hickman v. Block,* 81 F.3d 98 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 276, —— L.Ed.2d —— (1976), we held that "the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen." *Id.* at 101. We concluded that because Hickman could show no legal injury, he lacked standing to bring an action challenging the constitution-

ality of a California firearm permit issuance policy. *Id.* *Hickman* is directly applicable here and forecloses plaintiffs' attempt to assert standing for their Second Amendment challenge to the Crime Control Act.[1]

*Hickman* does not, however, affect plaintiffs' standing to assert Ninth Amendment or Commerce Clause claims. We have not previously addressed whether the Ninth Amendment protects an individual right to possess firearms. We have in other contexts, however, observed that the Ninth Amendment "has not been interpreted as independently securing any constitutional rights for purposes of making out a constitutional violation." *Schowengerdt v. United States*, 944 F.2d 483, 490 (9th Cir.1991) (rejecting Navy civilian engineer's Ninth Amendment claim arising out of allegedly improper investigation and discharge), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992); *see also Strandberg v. City of Helena*, 791 F.2d 744, 748–49 (9th Cir.1986) (rejecting plaintiffs' § 1983 claim based on the penumbra of the Ninth Amendment in the absence of some specific constitutional guarantee); *accord* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 776 n. 14 (2d ed. 1988) ("It is a common error, but an error nonetheless, to talk of 'ninth amendment rights.' The ninth amendment is *not* a source of rights as such; it is simply a rule about how to read the Constitution.") (emphasis in original).

Although the Supreme Court has never addressed the issue, three circuits have explicitly rejected the theory that the Ninth Amendment encompasses a right to bear arms independent of the Second Amendment. *See United States v. Broussard*, 80 F.3d 1025, 1041 (5th Cir.) ("We are not persuaded to discover or declare a new constitutional right to possess weapons under the Ninth Amendment on the basis of Merritt's proffered 'authority' [a law review article]."), *cert. denied*, —— U.S. ——, 117 S.Ct. 264, ——

L.Ed.2d —— (1996); *Quilici v. Village of Morton Grove*, 695 F.2d 261, 271 (7th Cir. 1982) ("Appellants may believe the ninth amendment should be read to recognize an unwritten, fundamental, individual right to own or possess firearms; the fact remains that the Supreme Court has never embraced this theory."), *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983); *United States v. Warin*, 530 F.2d 103, 108 (6th Cir.) (rejecting defendant's Ninth Amendment challenge because "[w]e simply do not conceive of the possession of an unregistered submachine gun as one of those 'additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments' ") (quoting *Griswold v. Connecticut*, 381 U.S. 479, 488, 85 S.Ct. 1678, 1684, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976).

■ We join our sister circuits in holding that the Ninth Amendment does not encompass an unenumerated, fundamental, individual right to bear firearms. *See* William Van Alstyne, *The Second Amendment and the Personal Right to Arms*, 43 Duke L.J. 1236, 1248 n. 43 (1994) ("Recourse to the same materials to fashion a Ninth Amendment ('unenumerated') right is not only largely replicative of the Second Amendment inquiry, but also singularly inappropriate under the circumstances—the right to bear arms is not left to the vagaries of Ninth Amendment disputes at all."); *but see* Nicholas J. Johnson, *Beyond the Second Amendment: An Individual Right to Arms Viewed Through the Ninth Amendment*, 24 Rutgers L.J. 1 (1992). Applying the rationale of *Hickman*, we conclude that plaintiffs can show no legal injury under the Ninth Amendment, and thus, lack standing to challenge the Crime Control Act on that basis.[2]

---

1. Recent dicta suggests that the Second Amendment might embody an individual right. *See United States v. Gomez*, 92 F.3d 770, 774 n. 7 (9th Cir.1996) ("[t]he Second Amendment embodies the right to defend oneself and one's home against physical attack."). That aberrant footnote, however, has no precedential value because it reflects the views of only one judge on

the panel, and the two concurrences specifically declined to join in the footnote. *Id.* at 778–79.

2. The following analysis, therefore, applies only to plaintiffs' standing to pursue their Commerce Clause claim.

## A. Constitutional Dimensions

Article III limits the jurisdiction of federal courts to "cases" and "controversies." *Casey v. Lewis,* 4 F.3d 1516, 1519 (9th Cir.1993). "Federal courts are presumed to lack jurisdiction, unless the contrary appears affirmatively from the record." *Id.* (citation and internal quotation marks omitted). Standing is an essential, core component of the case or controversy requirement. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

■■■ As the parties invoking federal jurisdiction, plaintiffs bear the burden of establishing their standing to sue. *Id.* at 561, 112 S.Ct. at 2136–37. To do so, they must demonstrate three elements which constitute the "irreducible constitutional minimum" of Article III standing. *Id.* at 560, 112 S.Ct. at 2136. First, plaintiffs must have suffered an "injury-in-fact" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to " 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between their injury and the conduct complained of. Third, it must be "likely"—not merely "speculative"—that their injury will be "redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct. at 2136 (citations omitted). Because plaintiffs seek declaratory and injunctive relief only, there is a further requirement that they show a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury. *Bras v. California Pub. Util. Comm'n,* 59 F.3d 869, 873 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996).

Plaintiffs assert standing on the basis of several categories of injury, including the existence of the Crime Control Act itself, threat of prosecution, chilling effect on their exercise of constitutional rights, and economic injury. As discussed below, however, none of these alleged injuries is "actual or imminent" and "concrete and particularized" enough to confer standing on plaintiffs. *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136.

### 1. Enactment of the Crime Control Act

■■■ Plaintiffs first contend that they need not wait for the government to enforce the criminal provisions of the Crime Control Act before they assert standing because the enactment of the Act itself has injured them. We have repeatedly admonished, however, that "[t]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Stoianoff v. Montana,* 695 F.2d 1214, 1223 (9th Cir.1983) (citation omitted); *see also Western Mining Council v. Watt,* 643 F.2d 618, 627 (9th Cir.1981), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981) (same language).

### 2. Threat of Prosecution

Plaintiffs next contend that they suffer a threat of being prosecuted under the Crime Control Act. Plaintiffs argue that because they intend to engage in conduct beyond Congress's authority to regulate under the Commerce Clause, but proscribed by the Crime Control Act, they " 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' " *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979) (quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)).

To assert standing on this basis, however, plaintiffs must show a *"genuine* threat of *imminent* prosecution"* under the Crime Control Act. *Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 688 (9th Cir.1984) (emphasis added); *see also Darring v. Kincheloe,* 783 F.2d 874, 877 (9th Cir.1986) ("an 'imaginary or speculative' fear of prosecution is not enough") (citation omitted); *Stoianoff,* 695 F.2d at 1223 ("a plaintiff must demonstrate a genuine threat that the allegedly unconstitutional law is about to be enforced against him"). Significantly, the mere "possibility of criminal sanctions applying does not of itself create a case or controversy." *Boating Industry Ass'ns v. Marshall,* 601 F.2d 1376, 1385 (9th Cir.1979) (citations omitted).

### a. Indefinite Intention to Violate the Act

■■■ The first obstacle that plaintiffs encounter in establishing that they face a genu-

ine threat of prosecution is that they have not articulated concrete plans to violate the Crime Control Act. Instead, plaintiffs merely assert that they "wish and intend to engage in activities prohibited by Section 922(v)(1)." The complaint does not specify any particular time or date on which plaintiffs intend to violate the Act. As the Supreme Court has observed, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan,* 504 U.S. at 564, 112 S.Ct. at 2138. Plaintiffs are thus in a different situation from the plaintiffs granted standing in *Babbitt* because the latter alleged that they had previously engaged in and would continue to engage in acts regulated under the challenged legislation. *Babbitt,* 442 U.S. at 303, 99 S.Ct. at 2311.

The acts necessary to make plaintiffs' injury—prosecution under the challenged statute—materialize are almost entirely within plaintiffs' own control. Plaintiffs have failed to show the high degree of immediacy that is necessary for standing under these circumstances. *Lujan,* 504 U.S. at 564–65 n. 2, 112 S.Ct. at 2138 n. 2. Thus, plaintiffs' reliance on *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), is misplaced. In *Roe v. Wade,* the Court held that Roe, a pregnant single woman, had standing to challenge the Texas criminal abortion laws because she was unable to obtain a legal abortion in Texas. *Id.* at 124–25, 93 S.Ct. at 712–13. Unlike plaintiffs in the instant case, Roe was not subject to criminal prosecution under the Texas statute, and thus, could challenge the statute only through a civil action. Plaintiffs' situation is more analogous to that of Dr. Hallford, who was denied standing in *Roe* because his own actions could and did subject him to criminal prosecution under the challenged statutes in state court, a forum in which he could challenge the constitutionality of the Texas statute. *Id.* at 126, 93 S.Ct. at 713. It is inapposite that there are no criminal cases pending against plaintiffs here. The Court expressly rejected Dr. Hallford's attempt to draw this distinction and to assert

standing as a "potential future defendant" only. *Id.*

#### b. *Specific Threat of Prosecution*

 A further flaw in plaintiffs' threat-of-prosecution argument is the absence of any threat by the government to prosecute them. Plaintiffs bear the burden of showing that the Crime Control Act is actually being enforced. *Rincon Band of Mission Indians v. County of San Diego,* 495 F.2d 1, 5 (9th Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). A specific warning of an intent to prosecute under a criminal statute may suffice to show imminent injury and confer standing. *See, e.g., Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974) (First Amendment case) (plaintiff was warned twice to stop handbilling and was told by police that he would likely be prosecuted if he handbilled again at the shopping center); *Ripplinger v. Collins,* 868 F.2d 1043, 1047 (9th Cir.1989) (First Amendment case) (deputy county attorney warned plaintiff that an obscenity charge would be initiated if he continued to distribute "hardcore pornography").

 On the other hand, a general threat of prosecution is not enough to confer standing. *See, e.g., Poe v. Ullman,* 367 U.S. 497, 501, 81 S.Ct. 1752, 1754–55, 6 L.Ed.2d 989 (1961) (plurality opinion) (mere allegation that state attorney intended to prosecute any offense against Connecticut law, including use of and advice concerning contraceptives held insufficient to confer standing); *Western Mining Council,* 643 F.2d at 626 (Secretary's statement that "plaintiffs cannot dig in the ground" not a sufficiently specific threat of prosecution); *Rincon Band,* 495 F.2d at 4 (sheriff's statement to tribal members that county ordinance prohibiting gambling would be enforced within his jurisdiction insufficient).

Here, plaintiffs do not identify even a general threat made against them. Plaintiffs concede that they have not been threatened with arrest, prosecution or incarceration. At oral argument before the district court, plaintiffs' counsel represented that none of the plaintiffs are under any threat of prosecution.

Nor have plaintiffs demonstrated that a "prosecution is likely, or even that a prosecution is remotely possible." *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971). We have previously rejected claims of standing under these circumstances. *See, e.g., Darring,* 783 F.2d at 877; *Bailey v. Patterson,* 369 U.S. 31, 32, 82 S.Ct. 549, 550, 7 L.Ed.2d 512 (1962). Plaintiffs have established at most a possibility of their eventual prosecution under the Crime Control Act, which is clearly insufficient to establish a "case or controversy." *Jensen v. National Marine Fisheries Serv. (NOAA),* 512 F.2d 1189, 1191 (9th Cir.1975); *Western Mining Council,* 643 F.2d at 626.

### c. *Lack of Any History of Prosecutions*

 A final weakness in plaintiffs' threat-of-prosecution argument is the absence of any past prosecutions under the Act. Plaintiffs' inability to point to any history of prosecutions undercuts their argument that they face a genuine threat of prosecution. *Cf. Ullman,* 367 U.S. at 501, 81 S.Ct. at 1754–55 (plurality opinion) (no standing where only one prosecution had been initiated under the challenged statute in the past); *Western Mining Council,* 643 F.2d at 624 (no standing where plaintiffs failed to allege that the challenged statute had ever been applied or threatened to apply); *Rincon Band,* 495 F.2d at 4 (no standing where the record did not reveal if there had been a history of prosecution under the county ordinance).

The absence of prosecutions under the Crime Control Act differentiates this case from those where the government's willingness to use the challenged provisions in the past corroborated the imminence of the threat of prosecution. *See, e.g., Steffel,* 415 U.S. at 476, 94 S.Ct. at 1224 (concurring opinion) (actual arrest of plaintiff's companion); *Sable Communications of Cal., Inc. v. FCC,* 827 F.2d 640, 644 (9th Cir.1987) (prosecution of one of plaintiff's competitors in another state); *Ripplinger,* 868 F.2d at 1047 (indictment of five other individuals under the new obscenity statute); *American–Arab Anti–Discrimination Comm.,* 970 F.2d at 508 ("Each case in which the government already has ventured into prosecution under-

scores the government's willingness to use the challenged provisions . . .").

Plaintiffs cite *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), and *Compassion in Dying v. Washington,* 79 F.3d 790 (9th Cir.1996) (en banc), *cert. granted,* —— U.S. ——, 117 S.Ct. 37, 135 L.Ed.2d 1128 (1996), for the proposition that a history of prosecutions is not a prerequisite to establishing standing. In *Bolton,* the Court held that physicians had standing to challenge Georgia's criminal abortion statutes even though the record did not disclose that any of them had been prosecuted or threatened with prosecution in the past. 410 U.S. at 188, 93 S.Ct. at 745–46. In *Compassion in Dying,* we held that doctors had standing on their own behalf, as well as on behalf of their terminally ill patients, to challenge a Washington statute that made it a felony knowingly to aid another person to commit suicide. 79 F.3d at 795 n. 3.

In *Rincon Band,* we distinguished *Bolton* on two grounds. First, the two cases upon which *Bolton* exclusively relied—*Crossen v. Breckenridge,* 446 F.2d 833, 839–40 (6th Cir. 1971), *vacated,* 410 U.S. 950, 93 S.Ct. 1413, 35 L.Ed.2d 683 (1973), and *Poe v. Menghini,* 339 F.Supp. 986, 990–91 (D.Kan.1972)—involved either a history of prosecution under the challenged abortion statute or a record of ongoing investigation. *Rincon Band,* 495 F.2d at 6. Second, the abortion statute at issue in *Bolton* was the successor to another Georgia statute under which physicians were prosecuted. *Rincon Band,* 495 F.2d at 6; *Bolton,* 410 U.S. at 188–89, 93 S.Ct. at 745–46; *cf. Western Mining Council,* 643 F.2d at 626 (noting that *Rincon Band* distinguished *Bolton* on the basis of history of prosecutions). Because there was no history of prosecution under the San Diego ordinance at issue in *Rincon Band,* we concluded that the threat of prosecution was not sufficiently immediate to confer standing. *Rincon Band,* 495 F.2d at 6.

In addition to the distinctions we have previously drawn in *Rincon Band,* we note two further considerations militating against the application of *Bolton* and *Compassion in Dying* to the instant case. In both those cases, the doctors had standing to assert

their patients' rights. *See Compassion in Dying,* 79 F.3d at 795–96 (noting that *Singleton v. Wulff,* 428 U.S. 106, 116–17, 96 S.Ct. 2868, 2875–76, 49 L.Ed.2d 826 (1976), described *Bolton* as a case "where the Court also permitted physicians to assert the rights of their patients"). The doctors clearly sought to vindicate their patients' liberty interests—not their own right to perform abortions or assist in suicides. Regardless of the doctors' standing, the action in *Bolton* would have been justiciable based on the reasoning in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; the patients had standing based on their inability to obtain an abortion or to violate the statute. *See Bolton,* 410 U.S. at 187, 93 S.Ct. at 745. It was "a matter of no great consequence" then that the doctors were also given standing to assert the same rights on behalf of their patients. *Id.* at 188, 93 S.Ct. at 745–46. By contrast, the reasons for relaxing the standards for standing are less compelling where plaintiffs seek to assert their own constitutional rights, as in the instant case. Unlike *Bolton,* whether plaintiffs have standing here is determinative of whether the action may proceed at all.

Further, a violation of the abortion statute in *Bolton* required the actions of not only the physician, but also a woman desiring an abortion. Likewise, a physician could violate the Washington statute in *Compassion in Dying* only by assisting another person—a terminally ill patient—to commit suicide. The instant case, however, involves a statute that can be violated by a single person through the illicit possession of a banned semiautomatic assault weapon or large capacity magazine. The acts necessary to make plaintiffs' injury happen are entirely within plaintiffs' own control. As noted above, plaintiffs have failed to show the high degree of immediacy that is necessary under these circumstances. *Lujan,* 504 U.S. at 564–65 n. 2, 112 S.Ct. at 2138 n. 2.

### 3. *Chilling Effect*

■ Another injury that plaintiffs allege is the chilling of their desire and ability to purchase outlawed firearms. Certainly, plaintiffs face a difficult choice whether or not to engage in conduct prohibited under the Act. Nonetheless, their choice is "not unlike that forged by many regulatory statutes with criminal sanctions." *Boating Industry Ass'ns,* 601 F.2d at 1385. As the Fourth Circuit has noted, "[e]very criminal law, by its very existence, may have some chilling effect on personal behavior. That was the reason for its passage." *Doe v. Duling,* 782 F.2d 1202, 1206 (4th Cir.1986).

Plaintiffs' "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972); *Steffel,* 415 U.S. at 476, 94 S.Ct. at 1224 (Stewart, J., concurring); *American–Arab Anti–Discrimination Comm.,* 970 F.2d at 510 (committee lacked standing even if its members were "chilled"); *Hardwick v. Bowers,* 760 F.2d 1202, 1206 (11th Cir.1985) (heterosexual couple claiming that the anti-sodomy law "chilled" aspects of their private life lacked standing because they failed to show membership in a group likely to be prosecuted), *rev'd on other grounds,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Thus, the "existence of a 'chilling effect' . . . has never been considered a sufficient basis, in and of itself, for prohibiting . . . [government] action." *Younger,* 401 U.S. at 51, 91 S.Ct. at 754.

The only exception to this general rule has been the relaxed standards for overbreadth facial challenges involving protected speech. *Stoianoff,* 695 F.2d at 1223. In these First Amendment cases, the Supreme Court has recognized "chilling" effect as an adequate injury for establishing standing because the "alleged danger . . . is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988); *see also Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984) ("when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in

having the statute challenged"); *Dombrowski v. Pfister*, 380 U.S. 479, 486–87, 85 S.Ct. 1116, 1120–22, 14 L.Ed.2d 22 (1965).

Because plaintiffs' attack on the Crime Control Act does not implicate First Amendment concerns, their reliance on *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), is misplaced. In *Epperson*, the Court entertained a challenge to a statute that criminalized the teaching of evolution theory in public schools even though there was no record of any prosecutions under the statute. *Id.* at 101–02, 89 S.Ct. at 268–69. While conceding that *Epperson* could not be distinguished, we suggested in *Rincon Band* that "[p]erhaps [*Epperson*] is a special case involving First Amendment issues that makes it *sui generis.*" *Rincon Band*, 495 F.2d at 6. We observed that the Supreme Court's subsequent pronouncement on standing—*O'Shea v. Littleton*, 414 U.S. 488, 496–97, 94 S.Ct. 669, 676–77, 38 L.Ed.2d 674 (1974)—reinforced our opinion that *Epperson* is not controlling. *Rincon Band*, 495 F.2d at 6. Finally, we recently noted that the Supreme Court did not explicitly discuss the justiciability issue in *Epperson. Mack v. United States*, 66 F.3d 1025, 1033 n. 13 (9th Cir.1995), *cert. granted*, — U.S. —, 116 S.Ct. 2521, 135 L.Ed.2d 1046 (1996). Thus, the Court's exercise of jurisdiction in *Epperson* is not precedent for the existence of jurisdiction. *Indian Oasis–Baboquivari Unified Sch. Dist. v. Kirk*, 91 F.3d 1240, 1243 (9th Cir.1996). For all these reasons, *Epperson* does not support plaintiffs' contention that the alleged chilling effect of the Crime Control Act is a sufficient injury-in-fact.

### 4. *Economic Injury*

■ Finally, plaintiffs allege economic injury. They contend that the Crime Control Act has caused the price of banned devices and grandfathered arms to increase "from 40% to 100%," thus hindering their ability to exercise their constitutional rights.

■ Economic injury is clearly a sufficient basis for standing. *Central Ariz. Water Conservation Dist. v. United States EPA*, 990 F.2d 1531, 1537 (9th Cir.), *cert. denied*, 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993). Nonetheless, plaintiffs' asserted financial injury here fails the second prong of the *Lujan* test; plaintiffs fail to demonstrate that their alleged economic injury is fairly traceable to the Crime Control Act. *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136.

As the district court noted, the Act is neither the only relevant piece of legislation nor the sole factor affecting the price of grandfathered weaponry. 926 F.Supp. at 1423. In California, the Roberti–Roos Assault Weapons Control Act of 1989, Cal.Pen. Code §§ 12275–12290, also bans the manufacture, sale and distribution of certain delineated assault weapons. Thus, any finding that the Crime Control Act had a significant impact on the increase in prices of weapons would be tantamount to sheer speculation. *Cf. Common Cause v. Department of Energy*, 702 F.2d 245, 251 (D.C.Cir.1983) ("where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses.").

Another fatal flaw with plaintiffs' economic injury theory is that it is third-party weapon dealers and manufacturers—not the government defendants—who have raised the prices of assault weapons. Although the Crime Control Act may tend to restrict supply, nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons. Under *Lujan*, plaintiffs' injury does not satisfy the requirements of Article III because it is "th[e] result [of] the independent action of some third party not before the court." 504 U.S. at 560, 112 S.Ct. at 2136 (amendments in original); *cf. Boating Industry Ass'ns*, 601 F.2d at 1380 ("if the injury stems not from the government action disputed, but from an independent source, a federal court cannot provide the plaintiff redress by directing the government to alter its action").

### 5. *Additional Claims of Injury*

■ The two associational plaintiffs have standing to sue on behalf of their members only if (a) their members would otherwise have standing to sue in their own right; (b) the interests that the organizations seek to

protect are germane to their purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The San Diego Militia and the San Diego Gun Rights Committee fail to establish the first requirement here because, as discussed above, their individual members have not suffered an injury-in-fact. Individual plaintiff Wallner asserts no additional claims of injury as president of the San Diego Militia, and thus, he also lacks standing.

■ Plaintiff Skane alleges an additional injury in that the Crime Control Act's license application provisions force him to comply with San Diego Municipal Ordinances in violation of his right to privacy. *See* 18 U.S.C. § 923(d)(1)(F)(i). Skane does not allege, however, that he is a current license applicant. Nor does he allege any facts to show how § 923(d)(1)(F)(i) otherwise affects him. Moreover, at oral argument before the district court, the government represented that Skane's current license does not expire until November 1997. Plaintiffs do not dispute this fact. Thus, § 923(d)(1)(F)(i) does not apply to Skane, and he lacks standing to challenge the statute.[3]

■ Plaintiff Buettner, a retired Marine officer, alleges that the Crime Control Act discriminatorily allows retired law enforcement officers to possess an assault weapon, but makes no analogous provision for retired military officers. For reasons unrelated to the Act, Buettner was not given any weapon upon his retirement from the Marine Corps in 1990. Buettner fails to show either how the Crime Control Act has caused him any injury or how injunctive relief would cure his purported injury. *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136. Thus, he also lacks standing.

In sum, plaintiffs fail to allege a " 'personal stake in the outcome' such as to 'assure that

concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *O'Shea,* 414 U.S. at 494, 94 S.Ct. at 675 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The district court did not err in concluding that plaintiffs lack standing.

**B. *Prudential Concerns***

■ "In addition to its constitutional components, standing doctrine also includes several 'judicially self-imposed' constituents, grounded in comity and prudence." *Hickman,* 81 F.3d at 101 n. 4 (citation omitted). In addition to their failure to establish the constitutional minimum of Article III standing, plaintiffs also fail to meet prudential standing requirements. *Id.; Darring,* 783 F.2d at 878.

As applied to this case, the most relevant of these prudential considerations is that

> even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches.

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (citation omitted); *see also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Here, plaintiffs' allegations of threatened prosecution and increased prices affect not only the named plaintiffs, but also anyone desiring to possess semiautomatic assault weapons. Plaintiffs' alleged harms amount to no more than a " 'generalized grievance' shared in substantially equal measure by . . . a large class of citizens," and thus do not

---

**3.** Moreover, Skane has an independent legal obligation to comply with the San Diego Municipal Ordinances. If he believes that he does not, his

remedy is directly to challenge the ordinances by a suit against the City of San Diego.

warrant the exercise of jurisdiction. *Western Mining Council,* 643 F.2d at 632.

## V. RIPENESS

■ The district court also found that plaintiffs' claims were not ripe for review. Ripeness is "peculiarly a question of timing." *Buckley v. Valeo,* 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976) (citation omitted). To determine whether plaintiffs' claims are ripe for review, we evaluate (1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if we decline to consider the issues. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983) (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967)).

### A. *Fitness of the Issues for Judicial Decision*

■ With regard to the first inquiry, pure legal questions that require little factual development are more likely to be ripe. *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1434–35 (9th Cir.1996) (whether Congress delegated too much authority to the President under a certain Act, whether a particular regulation could withstand a facial challenge under the First and Fifth Amendments, and whether the regulation contradicted an international treaty were legal questions ripe for review); *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515–16 (issue was ripe where all parties agreed that it was purely legal and a matter of congressional intent).

■ In contrast to *Freedom to Travel Campaign* and *Abbott Laboratories,* the issues in the instant pre-enforcement challenge are not purely legal. A concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate without running afoul of the Commerce Clause. *Cf. Portman v. County of Santa Clara,* 995 F.2d 898, 903 (9th Cir. 1993) (public defender's failure to point to any clients who received substandard representation as a result of the challenged statute made it impossible and premature to determine whether the statutory scheme infringed on the Sixth Amendment rights of any clients at all); *American–Arab Anti–Discrimination Comm.,* 970 F.2d at 510 (declining to exercise jurisdiction on a "sketchy record ... with many unknown facts"). As we have previously observed, "the District Court should not be forced to decide ... constitutional questions in a vacuum." *Id.* (quoting *W.E.B. DuBois Clubs v. Clark,* 389 U.S. 309, 312, 88 S.Ct. 450, 452, 19 L.Ed.2d 546 (1967)). At this point, a decision on the merits of plaintiffs' constitutional claims would be devoid of any factual context whatsoever. Neither the district court nor this court can "be umpire to debates concerning harmless, empty shadows." *Ullman,* 367 U.S. at 508, 81 S.Ct. at 1758 (plurality opinion).

Further, because the Crime Control Act does not implicate First Amendment rights, it may be challenged for vagueness only as applied. *United States v. Martinez,* 49 F.3d 1398, 1403 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 749, 133 L.Ed.2d 696 (1996), *and superseded by statute on other grounds as stated in United States v. Randolph,* 93 F.3d 656, 661 (9th Cir.1996); *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). Thus, the problem presented by the lack of a factual context is particularly acute in light of plaintiffs' vagueness, overbreadth and ambiguity claims.

### B. *Hardship to the Parties*

With regard to the second prong of the ripeness test, we have previously considered a threat of criminal penalty to be hardship. *Freedom to Travel Campaign,* 82 F.3d at 1435. Nonetheless, as discussed above, none of the plaintiffs have been charged under the Act with any criminal violation. Nor do plaintiffs face a credible threat of prosecution. Thus, any hardship caused by our decision to delay resolution of plaintiffs' claims does not justify the exercise of jurisdiction. *Cf. American–Arab Anti–Discrimination Comm.,* 970 F.2d at 511 (issue premature

where none of the individual plaintiffs were at the time charged under the challenged provisions); *Mack*, 66 F.3d at 1033 (issue not ripe because neither plaintiff had been criminally charged under the challenged statute). Plaintiffs will have the opportunity to raise their constitutional objections to the Crime Control Act if and when the government initiates a criminal prosecution against them under the statute. *Id.; American–Arab Anti–Discrimination Comm.*, 970 F.2d at 511.

## VI. CONCLUSION

Plaintiffs have not met their burden of establishing a "concrete and particularized" and "actual or imminent" injury caused by the Crime Control Act. *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. Indeed, it would be difficult to imagine a circumstance under which plaintiffs could have made a more feeble showing of injury-in-fact. To grant plaintiffs standing to challenge the constitutionality of the Crime Control Act in the circumstances of this case would eviscerate the core standing requirements of Article III and throw all prudential caution to the wind. Likewise, to hold that their claims are ripe for adjudication in the absence of any factual context would essentially transform district courts into the general repository of citizen complaints against every legislative action.

The judgment of the district court is

**AFFIRMED.**[4]

---

4. Because plaintiffs are not in any sense "prevailing" parties under our resolution of this appeal, we deny their request for attorney's fees under 42 U.S.C. § 1988.