401 F.3d 230
 FRANK KRASNER ENTERPRISES, LTD., d/b/a Silverado Gun Show, d/b/a Silverado Promotions; RSM, Incorporated, d/b/a Valley Gun & Police Supply; Robert D. Culver, Individually and Member of Montgomery Citizens for a Safer Maryland, Plaintiffs-Appellees,
v.
MONTGOMERY COUNTY, MARYLAND, Defendant-Appellant.
 No. 04-1030.
 United States Court of Appeals, Fourth Circuit.
 Argued: December 1, 2004.
 Decided: March 11, 2005.
 
 ARGUED: Clifford Lee Royalty, county attorney's office for the County of Montgomery, Rockville, Maryland, for Appellant. Jonathan Paul Kagan, Brassel & Baldwin, P.A., Annapolis, Maryland, for Appellees. ON BRIEF: Charles W. Thompson, Jr., County Attorney, Marc P. Hansen, Chief, General Counsel Division, Karen L. Federman Henry, Principal Counsel for Appeals, Rockville, Maryland, for Appellant. Alexander J. May, Brassel & Baldwin, P.A., Annapolis, Maryland, for Appellees.
 Before LUTTIG and GREGORY, Circuit Judges, and W. Craig BROADWATER, United States District Judge for the Northern District of West Virginia, sitting by designation.
 Reversed by published opinion. Judge GREGORY wrote the opinion, in which Judge LUTTIG and Judge BROADWATER joined.
 GREGORY, Circuit Judge:
 
 
 1
 In this case we examine whether a gun-show promoter and an exhibitor at that promoter's gun shows have standing to challenge in federal court a county law that denies public funding to venues that display and sell guns. We hold that no such standing exists. Accordingly, we reverse the ruling of the district court.
 
 I.
 
 2
 Since 1990, Frank Krasner Enterprises, Ltd. ("Krasner") has been in the business of putting on gun shows in the state of Maryland. For his shows in Montgomery County, Maryland, Krasner has biannually leased between 13,000 to 18,000 square feet of space at a venue in the City of Gaithersburg called the Montgomery County Agricultural Center ("Ag Center").[1] Co-Appellee RSM, Inc. is a regular exhibitor at these gun shows who sells firearms and related equipment and also discusses the use and value of firearms. The Ag Center is privately owned by a non-profit group, but has received occasional, yet substantial, funding from Montgomery County for various projects.
 
 
 3
 On May 16, 2001, the Montgomery County Council amended Chapter 57 of the Montgomery County Code. Exclusively at issue here is section 57-13 of the Code, entitled "Use of Public Funds."[2] It states:
 
 
 4
 (a) The County must not give financial or in-kind support to any organization that allows the display and sale of guns at a facility owned or controlled by the organization. Financial or in-kind support means any thing of value that is not generally available to similar organizations in the County, such as a grant, special tax treatment, bond authority, free or discounted services, or a capital improvement constructed by the County.
 
 
 5
 (b) An organization referred to in subsection (a) that receives direct financial support from the County must repay the support if the organization allows the display and sale of guns at the organization's facility after receiving the County support. The repayment must include the actual, original value of the support, plus reasonable interest calculated by a method specified by the Director of Finance.
 
 
 6
 Montgomery Co., Md.Code § 57-13. This section applies to guns sold and support received after December 1, 2003. Less than a month after section 57-13 became law, the Ag Center sent a letter to Krasner stating that, "we have been forced to make financial decisions to stop conducting activities which would invoke the County to impose financial sanctions on the Ag Center." J.A. 54. The letter made clear that this decision was a result of the County's funding restriction, not any problems with Krasner.[3]
 
 
 7
 The Ag Center's decision does not appear economically irrational: the County had given the Ag Center a total of more than $500,000 over the past ten years for certain discrete projects, and while the County was under no obligation to give the Ag Center anything, the record reveals no reason — other than holding gun shows — that the Ag Center could not expect to receive more funding from the County in the future.[4] Importantly, however, the letter also noted that the Ag Center did not wish to take Krasner's position opposing the bill:
 
 
 8
 As you know, from the very beginning of the gun show discussions back in October 2000, the Board of Directors attempted to steer clear of taking a political position on the matter of gun control, because it is not inherent to the Ag Center's mission in the community to take political positions on matters not directly related to agriculture.
 
 
 9
 J.A. 54.
 
 
 10
 Krasner, RSM, Inc., and a member of MCSM responded to the Ag Center's decision by suing Montgomery County in the United States District Court for the District of Maryland. Importantly, the Ag Center is not a party to this lawsuit, and the Appellees assert only their rights, not Ag Center's. Appellees' Br. at 17-20. The lawsuit claims that the County's spending provision violates Maryland's "Tillie Frank" law,[5] which empowers municipalities to ignore some overlapping county regulations, as well as the First and Fourteenth Amendments of the Constitution. The state-law argument is that section 57-13 is really a regulatory provision in the guise of a funding restriction, and thus inapplicable to the Ag Center because it is within the municipality of Gaithersburg, which has exempted itself from County regulations on which the City also has legislative authority. Appellees' Br. at 27-33. Appellees also argue that, even if section 57-13 is a spending restriction, it is invalid because there is no nexus between the purpose of the County's expenditure and prohibiting gun shows. See Id. at 34-42. The First Amendment claim is that section 57-13 singles out Appellees and burdens their "commercial free speech" while the Fourteenth Amendment argument is that section 57-13 violates the Equal Protection Clause because it treats gun shows differently without a rational basis. See Id. at 43-61.
 
 
 11
 The district court found against the County on the state-law claim and declined to reach the constitutional issues. Frank Krasner Enter., Ltd., v. Montgomery Co., Md., 166 F.Supp.2d 1058 (D.Md.2001). The County appealed, and this court vacated the district court's ruling and remanded for a determination of whether the plaintiffs had standing to sue. See Frank Krasner Enter., Ltd. v. Montgomery Co., Md., 60 Fed.Appx. 471, 472 (4th Cir.2003). On remand, the district court determined that Krasner and RSM alone (collectively, "Appellees") had standing. The County again appeals.
 
 II.
 
 12
 The standing doctrine is an indispensable expression of the Constitution's limitation on Article III courts' power to adjudicate "cases and controversies." Allen v. Wright, 468 U.S. 737, 750-51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The burden of establishing standing to sue lies squarely on the party claiming subject-matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). We review the question of whether a party possesses standing, like other questions of law, de novo. Marshall v. Meadows, 105 F.3d 904, 905-06 (1997).
 
 
 13
 The Supreme Court has held that two strands of standing exist: Article III standing, which enforces the Constitution's case or controversy requirement, and "prudential" standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 124 S.Ct. 2301, 2308-09, 159 L.Ed.2d 98 (2004). The requirements of Article III standing are numbingly familiar.[6] To have a claim heard in federal court, a plaintiff must establish: (1) an "injury in fact" to a "legally protected interest" that is both "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of that is "fairly traceable," and not "the result of the independent action of some third party not before the court"; and (3) a non-speculative likelihood that the injury would be redressed by a favorable judicial decision. See Lujan 504 U.S. at 560-61, 112 S.Ct. 2130 (emphasis added) (internal quotations, brackets, and citations omitted).
 
 
 14
 In Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court acknowledged that the plaintiffs, parents of black schoolchildren, stated an injury in fact (a diminished chance for their children to receive a racially integrated education) but found that the injury was not "fairly traceable" to the government's challenged actions (granting tax-exempt status to racially discriminatory public schools). Id. at 753, 756-58, 104 S.Ct. 3315. Rather, the Court held that the link was "highly indirect" and "attenuated at best" because the injury "`results from the independent action of some third party not before the court.'" Id. at 757, 104 S.Ct. 3315 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)) (emphasis added). That is, the Court could not be sure — but rather found it "speculative" — that, had the schools not been given tax-exempt status, the white children would have attended public rather than private schools. Id. at 758, 104 S.Ct. 3315.
 
 
 15
 Cases after Allen have held that when a plaintiff is not the direct subject of government action, but rather when the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," Lujan, 504 U.S. at 562, 112 S.Ct. 2130 (emphasis in original), satisfying standing requirements will be "`substantially more difficult.'" Id. (quoting Allen, 468 U.S. at 758, 104 S.Ct. 3315). This is so because, "[t]he existence of one or more of the essential elements of standing `depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.' "Id. (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (opinion of KENNEDY, J.)) (emphasis added).
 
 
 16
 We have previously denied standing because the actions of an independent third party, who was not a party to the lawsuit, stood between the plaintiff and the challenged actions. In Burke v. Charleston, 139 F.3d 401 (4th Cir.1998), we held that an artist who painted a mural for a business lacked standing to assert a First Amendment challenge to Charleston's historic conservation law, which banned the mural's display. Id. at 405-06. We found that the painter could not challenge the law's application to that mural because he had sold his rights to it and the owner could subsequently, at a whim, paint over the mural. Id. at 406-07. It was the mural's owner's right, not the artist's, and the owner's absence from the suit rendered it stillborn. Id.
 
 
 17
 We are not alone. In San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121 (9th Cir.1996), the Ninth Circuit denied standing to plaintiffs who alleged, among other things, that the Crime Control Act, which banned certain guns (but "grandfathered" in others) made the guns and ammunition the plaintiffs wished to purchase more expensive. Id. at 1124-30. Even granting that the law restricted supply and that the purported economic injury was an "injury in fact," that court found it to be a "fatal flaw" in the plaintiff's standing argument that "nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons." Id. at 1130. Rather, third parties such as weapon dealers and manufacturers broke the chain of causation by independently charging higher prices. Id. (citing Lujan, 504 U.S. at 560, 112 S.Ct. 2130). Other cases affirm this reasoning. See Pritikin v. Department of Energy, 254 F.3d 791, 797 (9th Cir.2001) (private citizen suing the Department of Energy and individual governmental officers to compel funding of medical monitoring program failed to meet Article III standing on the causation and redressability prongs because another agency, not before the court, decides whether to implement the program); Common Cause v. Dept. of Energy, 702 F.2d 245, 251-54 (D.C.Cir.1983) (denying Article III standing for consumer's suit against government which was "designed to leverage third-party fuel suppliers into making pricing and allocation decisions favorable to the consuming public."); cf. Area Transp., Inc. v. Ettinger, 219 F.3d 671, 672-74 (7th Cir.2000) (no standing to challenge agency's treatment of potential competitor because, inter alia, competitor was an independent actor not before the court).[7] Indeed, Appellees have not cited, and we are unaware of, a single case granting standing to a plaintiff challenging a government's decision not to subsidize a third party, not before the court, with whom the plaintiff does business.
 
 
 18
 We thus find that the Appellees lack standing for failure to establish the causation and redressability prongs.[8] The purported injury here, like that of the painter in Burke and the gun-buyers in San Diego County Gun Rights Committee, is not directly linked to the challenged law because an intermediary (in Burke, the mural-buyer; in San Diego County Gun Rights Committee, the gun-sellers; here, the Ag Center) stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain. We freely acknowledge that the law makes it more expensive — perhaps prohibitively so — for the Ag Center to lease space to Krasner. Specifically, the Ag Center would need to charge Krasner or any other gun show proprietors an amount at least equal to what it estimates it would lose from Montgomery County in grants.[9] The record leaves no doubt that this was a deal-breaker; Krasner only rents space for perhaps four days a year, and the County has given the Ag Center over a half-million dollars in grants. But that the County's decision may have been easy does not alter the analysis. Likewise, even if we were to hear the case and hold for the Appellees, we could not compel the Ag Center to rent space to Krasner (nor, crucially, could we even direct the County to subsidize the Ag Center in the future).
 
 
 19
 This would, then, be just the sort of advisory opinion federal courts must not give. In short, where a law only indirectly raises a plaintiff's prices by withholding funding to a third party not before the court, the directly affected third-party alone (here, the Ag Center, renting space), not the downstream plaintiff (Krasner) or any party even further downstream (RSM, Inc.), has standing to challenge the law in federal courts.
 
 III.
 
 20
 Krasner is once-removed from the County's actions and the Ag Center's rights — whatever they may have been — and RSM, Inc. is still another link down the broken chain of causation, and this is all too much for us. Thus, the Appellees lack standing. Accordingly, the district court's ruling to the contrary is
 
 
 21
 
 REVERSED.
 
 
 
 
 Notes:
 
 
 [1]
 At these gun shows, approximately 20-25% of the 220 to 320 tables rented are rented to firearms dealers. The remainder are rented to businesses selling firearms-related merchandise and to organizations that distribute gun-related information. A member of a group called Montgomery Citizens for a Safer Maryland, which rented space but did not sell firearms, sued individually and on behalf of the group. This plaintiff was dismissed by the district court for lack of standing and did not appeal
 
 
 [2]
 Section 57-11 of the Code, enacted along with section 57-13, explicitly prohibits the possession or sale of guns in certain circumstances that would affect Krasner. However, the County conceded early on in this litigation that it would not apply section 57-11 to the Ag Center because doing so would impermissibly impede on the authority of the City of Gaithersburg, which has, as is its right, exempted itself from all County regulations on which the City also has legislative authoritySee Gaithersburg City Code § 2-6; Md.Code Ann., art 23A, § 2B(b)(2); Md.Code Ann., criminal law, § 4-209.
 
 
 [3]
 Specifically, the letter stated that the Ag Center's Board of Directors appreciated Krasner's professional manner but, because of the new law, "now find ourselves in a difficult position. Therefore, until the County changes the legislation that imposes financial sanctions on violators of the gun show law, no further gun shows will be permitted in the grounds of the Montgomery County Agricultural Center, Inc." J.A. 54
 
 
 [4]
 Nor, however, does the record reveal that the Ag Centerwould receive any more funding, nor does it explain the Center's other sources of funding.
 
 
 [5]
 The law, Md.Code Ann., art 23A, § 2B(a) (2001), is so called because it was written to reverse the decision ofTown of Forest Heights v. Tillie Frank, 291 Md. 331, 435 A.2d 425 (1981), which upheld a county ordinance over a conflicting municipal ordinance.
 
 
 [6]
 The requirements of prudential standing are decidedly less settledSee Elk Grove Unified Sch. Dist., 124 S.Ct. at 2308-09 (stating that prudential standing "encompasses `the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked'") (quoting Allen, 468 U.S. at 751, 104 S.Ct. 3315). We do not engage in prudential standing analysis.
 
 
 [7]
 Other courts have dismissed similarly indirect injuries under the prudential, rather than Article III, strand of standing. InBen Oehrleins and Sons and Daughter, Inc. v. Hennepin County, Minnesota, 115 F.3d 1372, 1379-82 (8th Cir.1997), for example, the Eighth Circuit held that customers of waste-hauling firms satisfied Article III, but not prudential, standing requirements to challenge under the Commerce Clause a county law raising fees to waste haulers. Our result might be just the same under a prudential-standing analysis, but for a number of reasons (not least of which is that Krasner clearly does not claim third-party standing) we explicitly ground this decision in Article III's well-worn requirements.
 
 
 [8]
 We will assume without analysis that the "injury in fact" requirement is satisfied by the potential economic injury
 
 
 [9]
 This, in turn, would necessitate Krasner either passing along the costs to table-renters like RSM, Inc. (who may have to pass along costs to purchasers, etc.), or else charging higher admission and/or securing less profits