**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BARNUM TIMBER CO., a California
limited partnership,
  *Plaintiff-Appellant,*

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LISA
JACKSON,
  *Defendants-Appellees.*

No. 08-17715

D.C. No.
3:08-CV-01988-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
March 11, 2010—San Francisco, California

Filed February 3, 2011

Before: Stephen Reinhardt and Jay S. Bybee, Circuit Judges,
and James S. Gwin, District Judge.*

Opinion by Judge Bybee;
Dissent by Judge Gwin

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

2153

**COUNSEL**

Damien Schiff, Pacific Legal Foundation, Sacramento, California, for the appellant.

Andrew Mergen and Jason Walta, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the appellee.

---

**OPINION**

BYBEE, Circuit Judge:

Plaintiff-Appellant Barnum Timber Company ("Barnum") owns and operates nonindustrial timberlands and rangelands in Northern California, including land in the Redwood Creek watershed. It appeals the district court's dismissal of its action against the Defendant-Appellees, the U.S. Environmental Protection Agency ("EPA"). Barnum brought suit in district court under the Administrative Procedure Act ("APA") to challenge EPA's decision to retain the Redwood Creek as an impaired water body under § 303(d) of the Clean Water Act ("CWA"). The district court dismissed Barnum's suit for lack of Article III standing but granted leave to file an amended complaint. Barnum moved to amend the complaint, but the district court denied the motion for failure to remedy the standing deficiency and entered judgment dismissing the case. Barnum appeals.

We conclude that Barnum's amended complaint demonstrated that Barnum has standing as a landowner whose property values are adversely impacted to challenge EPA's retention of Redwood Creek as a § 303(d) impaired water body. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings.

## I.   BACKGROUND

Plaintiff-Appellant Barnum Timber Company ("Barnum") is a California limited partnership that owns property and conducts timber-harvesting operations in the Redwood Creek watershed near Eureka, California. Section 303(d) of the CWA, 33 U.S.C. § 1313(d), is part of what we termed "the Act's carrot-and-stick approach to attaining acceptable water quality without direct federal regulation of nonpoint sources of pollution." *Pronsolino v. Nastri*, 291 F.3d 1123, 1127 (9th Cir. 2002). The CWA requires that each state identify bodies of water within its boundaries that are impaired by effluent (§ 303(d)(1)(A)) or thermal (§ 303(d)(1)(B)) pollution and then periodically submit a list of the impaired water bodies to EPA for approval. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). Once EPA has approved a state's list, the state and EPA must develop maximum pollution levels for the impaired water bodies called "total maximum daily loads" (TMDL). 33 U.S.C. § 1313(d)(1)(C). Under the CWA, the state must create a plan to bring the impaired water bodies into compliance with the TMDLs. *Id.* As we have previously made clear, "[t]he states are required to set water quality standards for *all* waters within their boundaries regardless of the sources of the pollution entering the waters. If a state does not set water quality standards, or if the EPA determines that the state's standards do not meet the requirements of the [CWA], the EPA promulgates standards for those states." *Id.* at 1127.[1] In

---

[1] The dissent has mischaracterized the relationship between the states and EPA. *See* Dissent at 2169 ("it is the state that chooses if and how to implement a nonpoint source of a TMDL"); 2170 ("the majority opinion incorrectly suggests that the EPA, and not California, controls nonpoint water standards"). As we have pointed out, the state has the initial responsibility to set water standards, but EPA may step in if the state fails to promulgate standards entirely or fails to set appropriate standards. *See* 33 U.S.C. § 1313(b)(1) (authorizing EPA to set water quality standards for a state), (c)(3)-(4) (similar); *Pronsolino*, 291 F.3d at 1129 (noting that EPA disapproved California's 1992 list and added seventeen water segments to a new § 303 list), 1140 ("Congress definitely requires that the states or the EPA establish TMDLs for all pollutants in waters in § 303(d)(1) lists").

the State of California, any water bodies included on the § 303(d) list are also subject to state regulations. CAL. CODE REGS. tit. 14, § 898.

Redwood Creek was first placed on California's § 303(d) list in 1992. It has remained on the list since that time. In 2006, California reevaluated its § 303(d) list, as it is required by statute to do periodically, 33 U.S.C. § 1313(d)(2), and submitted it to EPA for approval, with Redwood Creek listed as being impaired by both sediment and temperature. EPA approved the list, including the Redwood Creek's listing as an impaired water body. *See* 72 Fed. Reg. 12175 (2007).

Barnum sued EPA in federal district court, challenging EPA's decision to "retain Redwood Creek on the Section 303(d) list of impaired water bodies" as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Barnum claimed two bases for its injury: First, it argued that, as a consequence of EPA's decision, it had "suffered extra costs to satisfy land use restrictions" triggered by the Redwood Creek's § 303(d) listing, and second, that it "has seen its property values decrease."

EPA moved for dismissal for lack of constitutional standing. The district court granted that motion without prejudice for leave to amend the complaint. The district court found that Barnum's first complaint "offered only conclusory and non-specific claims of injury" and failed to establish that their alleged injuries "were caused by or are in any way connected to the EPA's 2006 approval of California's listing of Redwood Creek." Specifically, the district court found that Barnum had "identifie[d] no connection between the state regulation causing its injury and the EPA's Section 303(d) action" and that Barnum had "offer[ed] nothing to support" its assertion of reduced property values, "other than the bare allegation itself."

Barnum moved to file an amended complaint and attached declarations by Thomas M. Herman and James M. Able, California forestry experts, who explained that the property value of Barnum's land had decreased because of the Redwood Creek's § 303(d) listing. But the district court denied Barnum's motion because "the proposed amendment would not cure the standing problem," dismissed the action, and entered final judgment against Barnum. Barnum here appeals.[2]

## II. STANDING

The district court's decisions to dismiss Barnum's initial complaint, to dismiss Barnum's motion to file an amended complaint, and to enter judgment dismissing Barnum's case all center on a single question: Does Barnum have standing to challenge EPA's retention of Redwood Creek as a CWA § 303(d) impaired water body? Specifically at issue here is whether Barnum's amended complaint meets the constitutional requirements for standing.[3]

[1] Article III of the U.S. Constitution confines federal courts to hearing only "cases" and "controversies." Standing is a core component of the Article III case or controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish constitutional standing, plaintiffs

---

[2]Because standing is a question of law, we review the district court's determination de novo. *See San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1124 (9th Cir. 1996) (stating that standing is a question of law to be reviewed de novo); *Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004) ("Whether . . . a denial [of leave to amend] rests on an inaccurate view of the law and is therefore an abuse of discretion requires us to review the underlying legal determination *de novo*." (internal citations omitted)).

[3]Because we find that Barnum's claim that the inclusion of Redwood Creek on the § 303 list caused its property values to diminish, we do not reach Barnum's second ground, that its property values diminished because the § 303 listing triggers additional California regulations that impose additional costs on Barnum's use of its property.

must demonstrate three elements, which constitute the "irreducible . . . minimum" of Article III standing, *id.* at 560: (1) *injury-in-fact*—plaintiff must allege "concrete and particularized" and "actual or imminent" harm to a legally protected interest, *id.* at 560-61; (2) *causal connection*—the injury must be "fairly traceable" to the conduct complained of, *Allen v. Wright*, 468 U.S. 737, 751 (1984); and (3) *redressability*—a favorable decision must be "likely" to redress the injury-in-fact, *Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61. We will discuss each element in turn.

### A.  *Injury-in-Fact*

We begin our analysis with the first element of constitutional standing: injury-in-fact. We acknowledge injury-in-fact was not raised as an issue for appeal: the district court found EPA had conceded the existence of Barnum's injury-in-fact, and neither party argued the existence of injury-in-fact in their briefs on appeal. But because "standing is a necessary element of federal-court jurisdiction," *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009), we must ensure Barnum has met all the requirements of constitutional standing. Understanding Barnum's injury will help frame the remaining issues as well.

**[2]** Barnum alleges as its injury-in-fact that it suffered a reduction in the economic value of its property in the Redwood Creek watershed. A specific, concrete, and particularized allegation of a reduction in the value of property owned by the plaintiff is sufficient to demonstrate injury-in-fact at the pleading stage. *See Lujan*, 504 U.S. at 560. In this case, Barnum has submitted two declarations by forestry experts, testifying to the property value reductions. Certainly the Supreme Court has been satisfied by less. In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), for example, the Court found that a complaint including a request for "damages for the temporary taking of [the plaintiff's] property" was sufficient to establish injury-in-fact at the pleading

stage. *Id.* at 1014 n.3. Thus we hold Barnum has met its burden of demonstrating injury-in-fact.

Unlike injury-in-fact, the remaining two elements of constitutional standing are disputed in this appeal: *causal connection*, that is whether Barnum's alleged injuries are fairly traceable to EPA's decision to retain Redwood Creek as an impaired water body under CWA § 303(d); and *redressability*, whether a favorable judgment for Barnum in its case against EPA would resolve or ameliorate Barnum's alleged injury-in-fact.

## B.   *Causal Connection*

Barnum argues that its Redwood Creek property value reduction is causally connected to EPA's retention of Redwood Creek as an impaired water body in "two distinct and individually adequate" ways: (1) "the Section 303(d) listing has reduced the value of Barnum's property by feeding the public's and the market's perception that Barnum's timber operations are restricted by the listing"; and (2) "the Section 303(d) listing has reduced the value of Barnum's property by triggering the application of Section 898 of the Forest Practice Rules." *See* CAL. CODE REGS. tit. 14, § 898. Because we credit Barnum's first argument (i.e., the effect of EPA's action on the market) and hold that Barnum has established a causal connection between its injury-in-fact and EPA's actions, we do not address Barnum's second causal connection argument.

**[3]** Barnum's amended complaint asserted that "Barnum's property in the Redwood Creek watershed has lost value simply because of the inclusion of Redwood Creek on the § 303(d) list as impaired by sediment and by temperature." As evidence of this, Barnum submitted two declarations by California Registered Professional Foresters, each testifying that "[t]he United States Environmental Protection Agency's listing of Redwood Creek as an impaired water body under the CWA has significantly reduced the value of Barnum's timber-

lands in the Redwood Creek watershed." (Declaration of Thomas M. Herman, an attorney, licensed professional forester, and Former Director and President of the California Licensed Foresters Association; Declaration of James L. Able, a forestry consultant and licensed professional forester.) Herman's declaration explains that public perception is the basis for Barnum's belief that EPA's listing is causally connected to the reduction in Barnum's Redwood Creek watershed property value: "The public has ready access to the Section 303(d) listings, including the listing of Redwood Creek. When a listing occurs, the public perceives—whether accurately or not—that the subject property will be subject to additional and onerous regulation. . . . In this case, the market reaction is such as to deem Barnum's property to be devalued because of the § 303(d) listing."

[4] Barnum's amended complaint, including the two declarations, is more than sufficient to support the causal connection element of Article III standing at this early stage of the proceeding. As the Supreme Court has noted, the evidence necessary to support standing may increase as the litigation progresses: "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each [constitutional standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. at 561 (1992); *see also Lucas*, 505 U.S. at 1014 n.3 ("*Lujan*, since it involved the establishment of injury in fact at the *summary judgment stage*, required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful."). Here, where Barnum has alleged specific facts plausibly explaining causality and supported by competent declarations, Barnum has more than met its burden to demonstrate the causal connection element of Article III standing at the pleading stage.

C.  *Redressability*

**[5]** Determining redressability "requires an analysis of whether the court has the power to right or to prevent the claimed injury." *Gonzales v. Gorusch*, 688 F.2d 1263, 1267 (9th Cir. 1982). In this case, if Barnum were successful in showing that EPA's listing of Redwood Creek was arbitrary or capricious, the district court has the power under the APA to grant the declaratory judgment and injunctive relief Barnum requests, which remedies would result in Redwood Creek being removed from the § 303(d) impaired water bodies list. 5 U.S.C. § 706(2)(A); *see Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 679-80 (9th Cir. 2007) (holding that the plaintiff met the redressability requirement of constitutional standing to challenge agency action under the APA because "all the inherent equitable powers of the District Court are available for the proper and complete exercise of its jurisdiction") (citation and alteration omitted). And, for reasons explained in the previous section, such removal will resolve the injury Barnum has allegedly experienced from its property's proximity to a § 303(d) impaired water body. Thus, if Barnum is successful on the merits at the district court, it is not "merely speculative . . . that the injury will be redressed." *Tyler v. Cuomo*, 236 F.3d 1124, 1133 (9th Cir. 2000) (internal citation omitted).

The district court relied primarily on our opinion in *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), but we think that case is distinguishable. In *San Diego County*, Appellant-Plaintiffs were two associations and three individuals, each of whom attempted to claim injuries resulting from passage of the Crime Control Act, a federal law that amended the Gun Control Act of 1968 to prohibit "the manufacture, transfer or possession of semiautomatic assault weapons and the transfer or possession of large capacity ammunition feeding devices." *San Diego Cty.*, 98 F.3d at 1124 (internal quotation marks removed). The plaintiffs had argued that the Crime Control Act's bans on certain

weapons had caused the price of those banned and grandfathered devices to increase, "thus hindering [the plaintiffs'] ability to exercise their constitutional rights" to buy guns. *Id.* at 1130. Referring generally to the viability of an economic injury as a claim for injury-in-fact, we acknowledged that "[e]conomic injury is clearly a sufficient basis for standing." *Id.* But we noted that in the case at hand, the plaintiffs' economic injury claim nevertheless "fail[ed] the second prong of the *Lujan* test"—causal connection. *Id.*

The *San Diego County* plaintiffs had failed to demonstrate the causal connection element of constitutional standing on economic injury grounds because they provided no evidence attesting that the federal government's actions *actually did cause* an increase in the prices, *id.* ("In California, the Roberti-Roos Assault Weapons Control Act [a state law] . . . also bans the manufacture, sale, and distribution of certain delineated assault weapons. Thus, any finding that the Crime Control Act had a significant impact on the increase of prices of weapons would be tantamount to sheer speculation."), nor could we find that the challenged law *required* an increase in the prices, *id.* ("Although the Crime Control Act may tend to restrict supply, nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons").

The district court concluded that the failings of the plaintiffs' case in *San Diego* were the failings of Barnum's case— "where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses." *Id.* (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)). Barnum's complaint presents no such defects here.

First, Barnum provided two declarations as evidence that the challenged government action—EPA's listing of Redwood Creek as a § 303(d) impaired water body—has in fact caused its property value to decrease. In *San Diego County*,

the plaintiffs contested government action that affected entire markets and correspondingly alleged price increases to the market as a whole, in which they merely hoped to be buyers. *Id.* In contrast, Barnum's allegation that the economic value of *its* property has been affected by the government action on an adjoining waterway leaves open the possibility Barnum could isolate the effects of the government action on its property.

[6] Second, Barnum's claim to diminished value does not depend on the unpredictable actions of third parties.[4] The Herman and Able declarations offer a commonsense assessment of the market for real property—in general, regulatory restrictions on one property that affect the uses to which a second property can be put will lower the second property's value.[5] The dissent's claim that "a general averment that conduct may decrease property value is not sufficient where that harm is not yet concrete and remains speculative," Dissent at 2174, is

---

[4]The dissent's repeated concern that it is California's regulations that have caused Barnum's alleged injuries misunderstands our opinion. *See* Dissent at 2179. Whether Barnum might have a cause of action against California does not affect whether Barnum has standing to sue EPA, just as whether Barnum will be successful on the merits in its suit against EPA does not affect whether Barnum has standing to pursue such a suit. At present, we are only concerned with whether Barnum's amended complaint has met the preliminary requirements to pursue its challenge against EPA in federal court. The questions of whether Barnum will win, or will be able to demonstrate standing later at the summary judgment stage, or would be able to sue California in a similar action are not before us.

We note that much of the dissent addresses Barnum's second ground for standing, which we have declined to address. *See supra* n.3.

[5]The dissent criticizes the declarations as "lack[ing] any sufficient foundation" and "[w]ithout any described polling regarding public perceptions and without any described experience in property appraisals." Dissent at 2171-72 n.2. Barnum first included the declarations in its amended complaint, likely to try to satisfy the district court, although nothing in the federal rules requires such declarations to support allegations in a complaint. The dissent's criticism seems out of place at this stage of the proceedings and would be better reserved for the merits.

simply inconsistent with the cases. *See*, *e.g.*, *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 183-84 (2000) (determining a plaintiff's declaration that "her home, which [i]s near [defendant]'s facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy" was an "affidavit[ ] and testimony presented" properly supporting the plaintiff's claim that the challenged action had "directly affected [her] . . . economic interests"); *Clinton v. City of N.Y.*, 524 U.S. 417, 433 (1998) ("The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement . . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies this part of the standing test") (citation and alterations omitted); *see also* 3 RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 16.4 at 1125 (4th ed. 2002) ("Many cases confer standing on consumers injured by an agency action that is likely to yield higher prices, on employers whose jobs or wage levels are jeopardized by an agency action that is likely to have an adverse effect on their employers' revenues, or on any other individual or group that is likely to suffer an adverse economic effect as a result of an agency action."). Here, EPA's action will lead to the imposition of regulatory restrictions on Redwood Creek, and Barnum has alleged that its property will be affected and that its property will decrease in value as a consequence. Where a successful challenge to EPA's action could reduce or eliminate those regulatory restrictions, causation and redressability are satisfied.

We do not think Barnum must allege that EPA is the sole source of the devaluation of its property. The dissent's claim that "the listing by the EPA is one factor, among many, that might affect the value of its property" may well be correct, Dissent at 2178, but we think the point is irrelevant to whether Barnum has standing to challenge EPA's action. Barnum has

alleged that at least EPA's listing of Redwood Creek has affected the value of its property. It need not eliminate any other contributing causes to establish its standing. *See Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005) (finding the injury fairly traceable to the defendant, even though "other factors may also cause" the injury, because "the link between the [challenged action] and [the alleged injury] is not tenuous or abstract").

## III.   CONCLUSION

**[7]** Because Barnum has sufficiently demonstrated its injury-in-fact, the causal connection between the alleged injury and the Appellee-Defendant, and the redressability of its claim should it be successful on the merits, Barnum has met the requirements of Article III standing. We conclude that the district court erred in denying the motion to amend. We vacate the district court's entry of judgment, reverse the district court's denial of Barnum's motion to amend its complaint, and remand for further proceedings.

REVERSED AND REMANDED.

GWIN, District Judge, dissenting:

Plaintiff-Appellant Barnum Timber Co. ("Barnum") appeals the district court's dismissal of its complaint against Defendants-Appellees United States Environmental Protection Agency and Lisa P. Jackson, Administrator of the Environmental Protection Agency (collectively, "EPA"). The district court dismissed the complaint after finding Barnum lacked standing to challenge EPA's approval of California's proposed list of environmentally challenged water bodies.

Because I believe that Barnum's claimed injuries are, at best, conjectural or hypothetical; because I believe there is no

causal connection between EPA's acts and the speculative injuries claimed by Barnum; and because I believe that nothing EPA could do would redress Barnum's speculative injury, I dissent. As described, any injury that Barnum has suffered—and it is nowhere clear that Barnum has suffered any injury—results from California's acts and could not be remediated by EPA. For these reasons, I would find that Barnum does not have standing to challenge EPA's action. Accordingly, I respectfully dissent from the majority opinion and would affirm the ruling of the district court.

## I.  BACKGROUND

Appellant Barnum is a California limited partnership that owns property in the Redwood Creek watershed in Northwestern California. Barnum challenges the inclusion of Redwood Creek in California's EPA-approved Section 303(d) list of the Clean Water Act ("CWA"), 33 U.S.C. § 1313(d).

Congress enacted the CWA in 1972, amending earlier federal water pollution laws that had proven ineffective. *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002). With the 1972 Act, Congress explicitly "recognize[d], preserve[d], and protect[ed] the primary responsibilities and rights of states to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources . . . ." CWA § 101(b), 33 U.S.C. § 1251(b).

The Act adopts different methods to address "point sources" and "nonpoint sources" of pollution. "Point sources of pollution are those where the pollutant flows from a discrete conveyance, such as a pipe or tunnel." *Friends of Pinto Creek v. EPA*, 504 F.3d 1007, 1011 (9th Cir. 2007) (internal quotation omitted). Nonpoint sources of pollution are non-discrete sources, such as runoff from a farmland or timber harvesting. *Id.* The Act mandates federal "effluent limitations" for point sources, defined as restrictions of pollutants discharged from point sources, which require "the application

of the best practicable control technology currently available
. . . ." CWA § 301(b)(1), 33 U.S.C. § 1311(b)(1); *see* CWA
§ 502(11), 33 U.S.C. § 1362(11). In contrast, the Act "pro-
vides no direct mechanism to control nonpoint source pollu-
tion," instead using the states to regulate nonpoint sources and
encouraging states through the "threat and promise of federal
grants . . . to accomplish this task." *Pronsolino*, 291 F.3d at
1126-27 (internal citations omitted).

CWA Section 303 is central to this litigation. CWA Sec-
tions 303(a)-(c) allows states to set water quality standards for
all waters within their boundaries. 33 U.S.C. §§ 1313(a)-(c).
Under the CWA scheme, each state compiles a list of prob-
lematic waters, known as the "Section 303(d) list," and sub-
mits that list to EPA for approval.

Each state must submit its Section 303(d) list with pro-
posed limitations—"total maximum daily load" ("TMDL")—
to EPA every two years. 40 C.F.R. § 130.7(d)(1). EPA then
either approves or disapproves the waters identified in the
state lists and the TMDL pollution loads established by the
states. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). If EPA
approves a state's Section 303(d) list and the TMDL pollution
loads included in the list, the state must incorporate them into
its "continuing planning process," as required under Section
303(e).[1] 33 U.S.C. § 1313(d)(2).

Although Section 303(d) requires states to submit lists and
pollution loads based on both point sources and nonpoint
sources of pollution, it is the state that chooses if and how to
implement a nonpoint source provision of a TMDL. *Pron-*

[1]Section 303(e) requires each state to have a "continuing planning pro-
cess" which must include, *inter alia*, effluent limitations and schedules of
compliance "at least as stringent as those required by [the Act]," TMDLs
as required under Section 303(d), and procedures for revising and imple-
menting water quality standards as required. 33 U.S.C. §§ 1313(e)(1), (3).
Each state must submit its Section 303(e) plan to the EPA for approval.
33 U.S.C. § 1313(e)(2).

*solino*, 291 F.3d at 1128-29. The Act simply provides financial incentives to encourage states to implement state regulations greater than those required under the CWA, such as nonpoint source TMDLs. *Id.* In other words, nonpoint loading limitations are only enforced under state law. *See National Resources Defense Council v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990) ("The [Clean Water] Act thus banned only discharges from point sources. The discharge of pollutants from nonpoint sources-for example, the runoff of pesticides from farmlands-was not directly prohibited.").

In amending the CWA in 1977, Congress recognized that states, not the federal government, would regulate nonpoint sources of pollution. *See* S. Rep. No. 95-370 at 635, 642-43 (1977) ("Congress made a clear and precise distinction between point sources, which would be subject to direct Federal regulation, and nonpoint sources, control of which was specifically reserved to State and local governments . . ."). Thus, as this court has previously explained, "[t]he upshot of this intricate scheme is that the CWA leaves to the states the responsibility of developing plans to achieve water quality standards if the statutorily-mandated point source controls will not alone suffice, while providing federal funding to aid in the implementation of the state plans." *Pronsolino*, 291 F.3d at 1128-29. However, in discussing standing, the majority opinion incorrectly suggests that the EPA, and not California, controls nonpoint water standards.

Redwood Creek first appeared on California's EPA-approved Section 303(d) list in 1992. In both 2002 and 2006, California submitted Section 303(d) lists to EPA that included Redwood Creek as impaired by both sediment and temperature. The EPA listing does not directly impact any use of Barnum's property. And in both 2002 and 2006, EPA adopted California's recommendations and approved California's listing of Redwood Creek as impaired by sediment and temperature.

On April 16, 2008, Barnum filed a Complaint in the district court for the Northern District of California, alleging that EPA violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by arbitrarily and capriciously approving a list of impaired waters submitted by California pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d). Barnum claims that it has been injured as a result of EPA approval of California's Redwood Creek's Section 303(d) listing because the listing diminishes the value of its lands.

EPA moved to dismiss the complaint for lack of subject matter jurisdiction, saying that Barnum does not have standing to bring this suit. The district court granted the Defendants' motion to dismiss, ruling that Barnum lacked standing after finding that the alleged injury was not fairly traceable to EPA and would not likely be redressed by a ruling in Barnum's favor.

On October 17, 2008, Barnum filed a motion for leave to file an amended complaint, attaching a proposed new complaint. In the proposed amended complaint, Barnum again alleged that the listing of Redwood Creek will cause a decrease in the value of its property and also submitted declarations from two licensed professional foresters to support its motion for leave to amend.[2] The district court again concluded

---

[2]These declarations lack any sufficient foundation. For example, Thomas Hermann describes experience with forestry management but gives no description of land value appraisal experience. He then acknowledges that "[o]ther regulations and laws undoubtedly reduce the value of Barnum's property" but then gives the opinion that the 303(d) listing "will undoubtedly reduce the value of Barnum's property." Hermann reaches this opinion against the admitted backdrop that any number of state regulations impacts the value of the Barnum property and that "[i]t is not feasible to isolate the precise incremental loss in value to Barnum's property caused by the Section 303(d) listing." Hermann then justifies his opinion that the 303(d) listing diminishes the property values: "When a listing occurs, the public perceives-whether accurately or not-that the subject property will be subject to additional and onerous regulation." Without

that "a broad spectrum of factors, both regulatory and non-regulatory, affect the value of plaintiff's property." The district court held that the new declarations offered nothing to controvert its earlier conclusion that Barnum "had not even attempted, much less succeeded, to isolate Section 303(d) listing from other factors affecting the value of its property." The court denied Barnum leave to amend the complaint and entered a final judgment in EPA's favor. Barnum filed a notice of appeal to this Court on December 15, 2008.

On appeal, Barnum advances two theories in support of its argument that it has standing to challenge EPA's action. Under both of those theories, Barnum alleges that the 303(d) listing will cause the value of its property to decrease. First, Barnum says that EPA's approval of Redwood Creek on California's proposed 303(d) triggered the application of California Forestry Regulation § 898, which in turn imposes analysis and mitigation requirements upon "any portion of a water-body located within or downstream of the proposed timber operation that is listed as water quality limited under Section 303(d) of the Federal Clean Water Act," CAL. CODE REGS. tit. 14, § 898, that will reduce Barnum's property value. Under its second theory, Barnum alleges that EPA's acceptance of California's listing of Redwood Creek on the 303(d) list directly caused a devaluation of Barnum's property because the public will perceive its land as subject to "additional and onerous regulation."[3]

---

any described polling regarding public perceptions and without any described experience in property appraisals, the majority opinion accepts Hermann's opinion without considering what training, education or experience qualifies him to say what "the public perceives." Thus, as it is Barnum's burden to provide "competent evidentiary support" for its jurisdictional averments, the Court may properly find that these unsupported affidavits are insufficient proof of standing. *See, e.g., Thomson v. Gaskill*, 315 U.S. 442, 446 (1942).

[3]This Court reviews a district court's dismissal for lack of standing *de novo*. *Rattlesnake Coalition v. EPA*, 509 F.3d 1095, 1100 (9th Cir. 2007).

## II.   ANALYSIS

In order to satisfy the "irreducible constitutional minimum of standing," a plaintiff must establish: (1) that it has suffered an " 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted).

I will examine each prong of the standing analysis to determine if Barnum possesses requisite standing to bring this suit.

### II.A   *Injury in Fact*

The majority opinion appropriately begins its analysis of standing on the first factor of the *Lujan* test, even though EPA concedes that this element is met. As "standing is a necessary element of federal-court jurisdiction[,]" the Court must consider it to ensure that Barnum possesses constitutional standing. *See Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009). The majority finds that this prong is satisfied because

The Court reviews the district court's factual findings relevant to standing for clear error. *Id.* Where standing is raised in connection with a motion to dismiss, the court accepts as true all material factual allegations in the complaint. *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009).

The Court reviews a district court's denial of leave to amend for abuse of discretion. *United States v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001). However, "whether such a denial rests on an inaccurate view of the law and is therefore an abuse of discretion, requires us to review the underlying legal determination *de novo*." *Smith v. Pacific Properties and Development Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004) (internal citations omitted).

Barnum alleges that the value of its property decreased due to the listing of Redwood Creek's in the Section 303(d) listing, saying that a "specific, concrete, and particularized allegation of a reduction in the value of property owned by the plaintiff is sufficient to demonstrate injury-in-fact at the pleading stage." Majority at 2160. However, this rule actually leads to exactly the opposite result.

Economic injury, such as a decrease in property value, is often a sufficient basis for standing. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992); *San Diego County Gun Rights Committee v. Reno*, 98 F. 3d 1121, 1130 (9th Cir. 1996) (citing *Central Ariz. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1537 (9th Cir. 1993)). Nonetheless, a general averment that conduct may decrease property value is not sufficient where that harm is not yet concrete and remains speculative.

Here, under either theory of harm, any injury that Barnum may suffer related to its property value is highly speculative and would depend upon the occurrence of a long chain of future events, including: Redwood Creek remaining on California's CWA Section 303(d) listing for temperature and sediment, California developing a temperature and sediment TMDL for Redwood Creek, California developing a TMDL that affects timber, and finally, California applying that plan in a manner that affects Barnum. If any of these contingent events—these are only a few examples—does not occur, then there would be no reason for Barnum's property value to fall.

As any injury alleged by Barnum is speculative and uncertain, I disagree with the majority that this prong of the standing inquiry is met. Barnum is unable to identify any particular conduct that plausibly caused a decrease in property value. Barnum is also unable to explain any decrease in value other than by vaguely pointing to market factors, and even then only positing what "the public perceives—whether accurately or not." These allegations are not sufficient to satisfy the con-

stitutional requirements of standing. *See Whitmore v. Arkansas*, 495 U.S. 149, 168 (1990) ("Allegations of possible future injury do not satisfy the requirements of Article III"); *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 930 (9th Cir. 2010) (holding that plaintiffs lacked standing where the "precise injury" could not be identified); *Louisiana Envt'l Action Network v. Browner*, 87 F.3d 1379, 1382-84 (D.C. Cir. 1996) (holding that plaintiffs lacked standing where injury depended upon a future chain of events). As such, I would affirm the district court's ruling on this ground.

## II.B    Fairly Traceable

Although I disagree with the majority and find that the district court's opinion should be affirmed because Barnum's allegations do not meet the first prong of the test for standing, I proceed to the second prong: whether the alleged injury is "fairly traceable" to EPA's conduct. Here, the majority opinion only analyzes Barnum's second theory of harm—that the inclusion of Redwood Creek on the Section 303(d) listing will directly cause a decrease in property value—and concludes that this prong of the standing test is met. I also disagree with the majority on this prong of the standing inquiry. I will address both of Barnum's theories of harm independently, since each is based on a distinct causation chain.

### i.    Section 303(d) Listing as Trigger for California Forestry Regulations

The "fairly traceable" prong of *Lujan*'s standing test does not require that the defendant directly cause the plaintiff's injury or even that the defendant's conduct be the last link in the chain of causation. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). However, an injury is not fairly traceable if the injury "results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). In determining if the injury alleged is fairly traceable to EPA's conduct, the Court must consider

whether EPA's action had some "determinative or coercive effect" upon the state of California that produced Barnum's injury. *Bennett*, 520 U.S. at 169.

The district court found that while California Forestry Regulation § 898 imposed requirements on Barnum, the injury was not fairly traceable to EPA's actions because it required the independent intervening action of a third party, the state of California. The district court's conclusion is correct.

In *Bennett v. Spear*, a group of ranchers and irrigation districts sued the Fish and Wildlife Service to invalidate a Biological Opinion that found a water project threatened species protected by the Endangered Species Act. 520 U.S. 154, 158-59 (1997). The Court concluded that the injury was fairly traceable to the Fish and Wildlife Service because the Biological Opinion had a "powerful coercive effect on the action agency" since the statutory scheme presupposed that the Biological Opinion would play a central role in the action agency's decision-making process, and action agencies very rarely choose to engage in conduct that the Service has concluded was likely to jeopardize an endangered species. *Id.* at 169. The Court found that the Biological Opinion in *Bennett* had "direct and appreciable consequences." *Id*. at 178.

The current suit is distinguishable, because EPA's Section 303(d) listing does not have a similarly "powerful coercive effect" upon California's regulatory bodies. As previously described, while the CWA establishes procedures for the states to identify polluted waterbodies and to set water quality standards, the statutory scheme gives the states broad discretion in implementing their plans. Although Section 303(d) requires the California Water Boards to identify impaired waters and to establish total maximum daily loads, Section 303(d) does not direct or require the California Department of Forestry to enact or to enforce Section 898 or to use any specific means to accomplish the TMDL.

Moreover, and further undercutting Barnum's position, Barnum's injury is most directly traceable to California's regulations, not EPA's. California enjoys broad discretion to regulate Redwood Creek as it sees fit within the statutory scheme established by the CWA. EPA's approval of the Section 303(d) listing has no "determinative or coercive effect" upon California's enactment, implementation, or enforcement of its Forest Practice Rules. California independently chose to condition application of one of its Forest Practice regulations on Section 303(d) listing. But more importantly, California alone decides what, if any, restrictions to place upon Barnum's operations.

Thus, I find that, under its first theory of harm, Barnum fails to meet the "fairly traceable" prong of the *Lujan* test as any alleged harm is caused not by EPA, but by the independent action of the state of California.

### ii. Section 303(d) Listing Directly Causing a Decrease in Property Value

The majority opinion analyzes Barnum's second theory of harm, finding this prong of the standing inquiry is met because Barnum sufficiently sets forth a "causal connection" between the alleged injury-in-fact (decrease in property value) and EPA's action.

I disagree. The majority concludes that Barnum's bare allegation that EPA's approval of California's decision to include Redwood Creek in the Section 303(d) list is sufficient to establish causation. Although the majority seems to rely heavily upon two declarations submitted by Barnum in support of its motion for an amended complaint, neither of these declarations supplement Barnum's allegations in any appreciable way. Rather, each simply repeats the allegation that EPA's decision to approve California's Section 303(d) listing caused a decrease in property value. Neither the proposed amended complaint nor the foresters' affidavits addresses the fatal flaw

in Barnum's allegations. Although Barnum alleges that the Section 303(d) list directly caused a decrease in its property value, Barnum never actually asserts a plausible allegation that the decrease in property value is caused by the actions of EPA.[4]

The majority spends several pages struggling to distinguish this court's prior decision in *San Diego County Gun Rights Committee v. Reno.* 98 F.3d 1121. I disagree with that analysis and would rely upon *San Diego County*; I think that case is sufficiently related and should be seen as precedent.

First, similar to *San Diego County*, a multitude of factors affects Barnum's alleged harm. At best, Barnum alleges that the listing by EPA is one factor, among many, that might affect the value of its property. Many factors, such as California state regulations, other federal regulations, market forces, or even natural events, affect the value of Barnum's property. Specifically, timber harvesting in California is subject to numerous state regulations unrelated to the EPA listing. [*See* E.R. at 9 ("California's forestry rules comprehensively regulate [Barnum's] conduct irrespective of Redwood Creek's Section 303(d) listing") (citing Cal. Pub. Res. Code §§ 4581-82; Cal. Code Regs. tit. 14 §§ 897, 911-29).] Importantly, the factual setting is quite similar to that in *San Diego County*, where both federal and state statutes banned the manufacture,

---

[4]The majority opinion does not subject Barnum's allegation that EPA listing caused the decrease in property value to any scrutiny, and instead accepts that allegation as proof of causation. Majority at 2161-62. However, Barnum's alleged injuries all stem from California's actions, and not the actions of EPA. Barnum's allegation that the injury is connected to EPA — although that connection is pled in the complaint — is not at all plausible and cannot support constitutional standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear on the record.") (internal quotation marks and citations omitted). Here there is no affirmative proof on the record that EPA listing caused the alleged decrease in property value.

sale, and distribution of certain assault weapons. 98 F.3d at 1124. *As in San Diego County*, other factors much more directly affect the property value of this property. This uncertain impact weighs strongly against a finding that causation is met.

Second, and more importantly, in concluding that EPA listing sufficiently affects property values to meet the causation requirement, the majority opinion incorrectly characterizes the Section 303(d) listing as a "regulatory restriction[ ] on one property that affect[s] the uses to which a second property can be put." Majority at 2179. This description leads to the seemingly natural conclusion that the listing more directly affects the property value. However, this claim is simply not true— the listing does not impose any direct regulations. Any future regulations imposed on nonpoint sources of water pollution in Redwood Creek would be enacted, if at all, by the state of California, and not by EPA. *Pronsolino*, 291 F.3d at 1128-29. Any injury to Barnum would only occur should California establish a temperature or sediment TMDL for Redwood Creek and adopt that plan in a manner that affects Barnum's property. The injury to Barnum, if any, would be traceable to California, rather than EPA.

Indeed, this circuit previously acknowledged that "the CWA leaves to the states the responsibility of developing plans to achieve water quality standards if the statutorily-mandated point source controls will not alone suffice, while providing federal funding to aid in the implementation of the state plans." *Id.* "California [chooses] both *if* and *how* it would implement the [ ] TMDL. States must implement TMDLs only to the extent that they seek to avoid losing federal grant money; there is no pertinent statutory provision otherwise requiring implementation of § 303 plans or providing for their enforcement." *Id.* at 1140[5]; *see also Defenders of*

---

[5] "California is free to select whatever, if any, land-management practices it feels will achieve the load reductions called for by the TMDL. Cal-

*Wildlife v. EPA*, 415 F.3d 1121, 1124 (10th Cir. 2005) ("Congress clearly intended the EPA to have a limited, non-rulemaking role in the establishment of water quality standards by states.") (citation and internal quotation omitted); *Sierra Club v. Meiburg*, 296 F.3d 1021, 1026-27 (11th Cir. 2002) ("Georgia has the primary authority and responsibility for issuing permits and controlling nonpoint source pollution in that state. It also has both the authority and the duty to compile the list of limited segments (the § 303(d) list), and establish TMDLs for each waterbody on the list.").

A break of this magnitude in the causal chain would lead to the failure of a cause of action in the tort context, and it is also fatal here. *See Lujan*, 504 U.S. at 560 ("injury must not be the result of the independent action of some third party not before the court") (citations and internal quotations omitted); *San Diego County*, 98 F.3d 1130 (holding that standing not met where harm is the result of independent third party not before the court).

The majority opinion seeks to distinguish *San Diego County* by stating that the plaintiffs in that case failed to demonstrate a causal connection because "they provided no evidence attesting that the federal government's actions *actually did cause* an increase in the prices . . . ," whereas here, Barnum alleges that the Section 303(d) listing directly caused a decrease in the property value of its property. Majority at 2164. However, as explained, the current claim fails for the same reason. If the value of Barnum's property actually decreases, it is not because of EPA's conduct, but rather because the listing indicates that the property may be subject

ifornia is also free to moderate or to modify the TMDL reductions, or even refuse to implement them, in light of countervailing state interests. Although such steps might provoke EPA to withhold federal environmental grant money, California is free to run the risk." *Pronsolino v. Marcus*, 91 F. Supp. 2d 1337, 1355 (N.D. Cal. 2000), *aff'd*, 291 F.3d 1123 (9th Cir. 2002).

to California state environmental regulations. California, not EPA, enacts and enforces regulations related to nonpoint sources. Thus, any decrease in property value related to the Section 303(d) listing results from the possibility of future state, not past federal, action.

Therefore, as I find that neither of Barnum's theories of harm established the requisite causal connection to show that the alleged injury is "fairly traceable" to the conduct of EPA, I would affirm the judgment of the district court on this ground.

*II.C    Redressability*

I also consider redressability, the third prong of the standing analysis. Determining redressability "requires an analysis of whether the court has the power to right or to prevent the claimed injury." *Gonzalez v. Gorusch*, 688 F.2d 1263, 1267 (9th Cir. 1982). Again, the majority opinion analyzes Barnum's second theory of harm—that the inclusion of Redwood Creek on the Section 303(d) listing will directly cause a decrease in property value—and concludes that this prong of the standing test is met. I disagree with the majority on this inquiry as well.

### i.    Section 303(d) Listing as Trigger for California Forestry Regulations

Barnum does not show a likelihood of redressability.[6] The mere fact that Section 898 refers to a Section 303(d) listing in one of its subsections does not itself show that the removal

---

[6]While EPA does not challenge the redressability requirement with respect to the Section 898 injury, this court may affirm the district court on any ground supported by the record. *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009). As the party seeking federal jurisdiction, Barnum bears the burden of showing that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 540 U.S. at 561.

of Redwood Creek from the 303(d) list would likely redress Barnum's claimed injury.

Barnum incorrectly claims that because the Section 303(d) listing triggers the application of Section 898 to Redwood Creek, EPA's inclusion of Redwood Creek on the list is the "but for" cause of its injury. As described earlier, the CWA leaves the implementation of clean water regulations to the states' discretion. California has implemented a comprehensive system of regulations for timber harvesters, which "comprehensively regulate [Barnum's] conduct irrespective of Redwood Creek's Section 303(d) listing." Thus, though one state regulation is tied to the Section 303(d) listing, the California regulations in total would impose costs upon Barnum even if Redwood Creek is removed from the Section 303(d) list. Moreover, even if Redwood Creek is removed from the Section 303(d) list, Section 898 itself might cause California to require Barnum to consider measures to improve the water in the Redwood Creek watershed. *See* CAL. CODE REGS. tit. 14 § 898.

Accordingly, I believe that Barnum fails to show that its alleged injury would be redressable because California regulations would continue to impose costs potentially affecting property values near Redwood Creek.

### ii.  Section 303(d) Listing Directly Causing a Decrease in Property Value

The majority opinion's analysis of standing's third element concludes that Barnum's alleged injury—a decrease in property value—could be redressed by a ruling favorable to Barnum. However, for many of the same reasons that Barnum's argument fails to satisfy standing's second prong, I find that Barnum fails to establish that its alleged injury could be redressed by a favorable ruling.

California continues to control the implementation of the land management practices in that state, and an order against

EPA would not redress Barnum's alleged injury. Indeed, California has not yet developed any specific TMDL that impacts Barnum. And, even if they are developed, California—not EPA—will decide how and if it will implement them. *Pronsolino*, 291 F.3d at 1140. As the district court noted, "at root, the injuries plaintiff alleges arise from California's forestry regulations, and not [from] any action of the EPA." *See San Diego County*, 98 F.3d at 1130; *see also Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009) (holding alleged injury not redressable where it depended upon the conduct of a third party); *Arakaki v. Lingle*, 477 F.3d 1048, 1064 (9th Cir. 2007) (holding that an injury is not redressable where the potential benefit of suit is speculative); *Boating Industry Ass'n v. Marshall*, 601 F.2d 1376, 1380 (9th Cir. 1979) ("[I]f the injury stems not from the government action disputed, but from an independent source, a federal court cannot provide the plaintiff redress by directing the government to alter its action.").

Accordingly, as I find that neither of Barnum's theories of harm establish that the injury alleged can be redressed by the relief requested, I would also affirm the judgment of the district court on this ground.

## III. CONCLUSION

Because I would hold that Barnum does not possess requisite standing to meet the requirements of Article III, I would affirm the district court's dismissal and respectfully dissent from the majority opinion.